**Staver Carriage Company, Appellee, v. American & British Manufacturing Company, Appellant.**

**Gen. No. 18,810.**

1. ACCORD AND SATISFACTION, § 1*—*when agreement does not constitute.* A subsequent agreement by the seller of goods which amounted to a mere promise to adjust the differences that had arisen over a breach of a warranty in a prior contract of sale, *held* not

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to amount to a settlement and satisfaction of all claims for damages resulting from a breach of the contract of warranty, where the agreement was not performed.

2. SALES, § 387*—*what not waiver of right to sue for breach of warranty.* Failure of the buyer to pay for goods that, after delivery, have been found to be defective and not suitable for the purpose for which they were purchased, or that in other respects are not as warranted, *held* not a waiver of the right to sue for breach of the warranty.

3. SALES, § 404*—*measure of damages for breach of warranty where article is sold for specific purpose.* Where an article is sold for a specific purpose, and the seller knows it, and warrants it to be of a particular quality and suitable for the purposes for which it is sold, and it is not as warranted and articles of the kind and quality contracted for cannot be purchased in the open market, the value of the article for such specific purpose is the basis of estimating damages, and if the special purpose for which it is to be used is a resale, or the production of some other article to be sold, then prospective profits are proper elements of damage, provided it is established by the evidence to a reasonable certainty that the article would have been sold as contemplated and how much profit would have been realized.

4. DAMAGES, § 61*—*when evidence of loss of profits admissible.* Where motors were purchased for the purpose of being installed in automobiles and sold and were warranted to be free from defects of material and workmanship and to be fit for the purpose for which they were purchased, *held* in an action for a breach of the warranty that it was not error to admit evidence of the loss of prospective profits.

5. SALES, § 402*—*when instruction authorizing recovery for loss of prospective profits not warranted by the evidence.* In an action for a breach of a warranty in a sale of motors, submitting to the jury by instructions the question of loss of prospective profits, *held* improper where there was no evidence from which the jury could determine the amount of profits, and no evidence on the question whether other motors of the same kind and quality were obtainable in the market at the time of the breach.

6. SALES, § 400*—*admissibility of defective parts of article sold.* In an action for a breach of a warranty in the sale of motors, the admission in evidence of the several parts of the motors *held* largely a matter of discretion with the trial court, and unless such discretion is abused its admission will not constitute reversible error.

7. SALES, § 400*—*preliminary proof necessary to introduction of defective parts of article sold.* In order to render admissible in evidence the several parts of a motor in an action for breach of a warranty, the preliminary proof should show that the parts are

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.*

substantially in the same condition that they were when such condition was material to the issue, or if they have been broken, worn, altered or marred since such time, the court should require evidence to show in what particular they have been changed, the use to which they were put, and, if material, the test or circumstances under which they were broken or marred, and this whether they are introduced to prove a fact or for the purpose of illustration.

8. EVIDENCE, § 223*—*when letters inadmissible as hearsay evidence.* In an action for breach of a warranty as to motors furnished plaintiff to be installed in automobiles, letters written by persons who were purchasers of the automobiles condemning the motor, *held* improperly admitted for the reason they were hearsay evidence.

9. SALES, § 402*—*when instruction in suit for breach of warranty improper.* In an action for breach of a warranty that motors furnished should be free from defects of material and workmanship, and that the motors should be fit for the purpose for which they were furnished, an instruction given for plaintiff which told the jury that the seller was required by its contract to furnish motors that would render automobiles in which they were installed reasonably saleable, if not otherwise defective is erroneous.

10. SALES, § 402*—*when instruction erroneous as assuming facts.* In an action for breach of a warranty in a contract for the sale of motors, an instruction *held* bad for the reason it assumed there was a market value for motors in the condition they were when received by the plaintiff.

Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1912. Reversed and remanded. Opinion filed October 7, 1914. Rehearing denied October 14, 1914.

MONTGOMERY, HART & SMITH, for appellant; LOUIS E. HART and JASPERSEN SMITH, of counsel.

BULKLEY, GRAY & MORE, for appellee.

MR. JUSTICE GRAVES delivered the opinion of the court.

Appellant, American & British Manufacturing Company, of Bridgeport, Connecticut, manufacture, among other things, gasoline motors. Appellee, the Staver Carriage Company, manufacture automobiles at Chicago, Illinois. On July 7, 1909, these parties entered

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

into a written contract, whereby appellant was to manufacture and deliver to appellee at stipulated times 500 four-cylinder gasoline automobile motors of a specified size and kind for the sum of $203 each. This contract contained the following stipulations:

"WHEREAS, the Manufacturer desires to manufacture for and sell to the Purchaser five hundred (500) automobile gasoline motors, and Purchaser, being a manufacturer of automobiles, desires to purchase said motors for use in the manufacture of motor cars. * * *

"Third, that each and every one of said motors will be thoroughly inspected and tested by manufacturer before shipment, and will be furnished complete, as per specifications, and ready to assemble in chassis. * * *

"Seventh, The Manufacturer guarantees and warrants to Purchaser that all motors manufactured and sold as aforesaid, shall be free from all defects of material and workmanship, that the workmanship and material thereof shall be thoroughly high class, and that said motors shall be fit for the purpose for which they are furnished.

"Eighth, That during fifteen months from the date of shipment of motors the manufacturer shall and will, upon notice, promptly replace, without cost to the Purchaser, or give credit for, at Purchaser's option, any defective motors or parts that shall be defective either in workmanship or material."

Appellant began the manufacture of these motors and on February 26, 1910, had delivered 331 of them to appellee. Of these, 36 were shipped on that day. On that day there were outstanding the promissory notes of appellee, of the face value of somewhat over $40,000, which had been given to appellant in settlement for motors delivered. The 36 motors shipped February 26, 1910, were not settled for promptly and appellant on March 22, 1910, wrote to appellee requesting a cash payment therefor. Appellee had previously complained to the representatives of appellant that the motors were defective and on March 28, 1910, wrote to appellant at Bridgeport, Conn., in substance, that

its representative, Mr. Hill, had admitted that the complaints made by appellee about the motors were justified and had promised that Mr. Gulick, the vice-president and general manager of appellant, would come to Chicago, but that he had not done so, and notifying appellant that it would refuse to pay the notes given for the motors as the same matured and that it had picked out about 100 motors which it proposed to return to appellant, and asking for shipping directions. This letter concludes as follows:

"To us, it looks as though Mr. Gulick did not care to come and see us, after knowing the truth as to the situation here. The engines which we will ship back to you, you may not return to us after you have repaired them as we cannot use them in our cars, as our customers will not take that kind of goods, and we have made a contract for other engines, which we shall put in our cars to replace those of yours which we cannot use; and if any more engines are shipped us, we shall refuse to accept them.

Yours very truly,

H. B. S."

Very shortly after this letter was received by appellant Mr. Gulick and a Mr. Hilfrey, the chief inspector of appellant, and a mechanic or two in its employ came to Chicago to investigate the complaints made by appellee concerning the motors. On April 1, 1910, the following writing was executed by the parties:

"Memorandum of Agreement made and entered into this first day of April, 1910, between the American & British Mfg. Co., party of the first part, and Staver Carriage Co., party of the second part.

"Witnesseth: Whereas the parties hereto made and entered into a contract bearing date the seventh day of July, 1909, by which it was agreed that party of the first part should sell and deliver to party of the second part five hundred (500) automobile gasoline motors as specified therein, deliveries and payments to be made as specified therein.

"And whereas it has also heretofore been agreed, subsequent to the making of aforesaid contract, that the purchaser, Staver Carriage Co., was only obligated to take four hundred (400) of the said five hundred (500) automobile gasoline motors.

"And whereas party of the first part has heretofore shipped and party of the second part has received three hundred thirty-one (331) of said motors, and that there now remains under said contract as amended, to be shipped by party of the first part and received by party of the second part sixty-nine (69) automobile gasoline motors.

"And whereas of the three hundred thirty-one (331) motors heretofore delivered many have proven defective, and party of the first part is now hereby ready and willing to repair such defects and put all said motors in first-class condition, and compensate party of the second part for expenses occasioned by such defects.

"Now, therefore, in consideration of one dollar in hand paid, the party of the first part releases party of the second part from the obligation to take and receive said sixty-nine (69) gasoline engines.

"It is hereby however mutually agreed between the parties hereto that party of the first part does hereby sell and agree to deliver any number of automobile gasoline motors, 4x4, 4 cylinder, prior to May 15, 1910, not exceeding sixty-nine (69) in number, which party of the second part may order from party of the first part, deliveries to be mutually satisfactory, and to be sold and delivered upon the same specifications, terms, conditions and warranties as contained in contract of July 7, 1909, no motors to be shipped without shipping instructions therefor in writing, and to be shipped as promptly thereafter as may be mutually agreed upon.

"It is further hereby agreed that party of the first part will furnish immediately the necessary material and men to adjust and put in first-class condition any and all engines heretofore delivered under contract dated July 7, 1909, subject to the acceptance of party of the second part upon its inspection, and party of

the first part hereby further agrees to pay, or allow credit, to party of the second part on rendering statement any and all expenses, such as, freight on cars which have been returned by agents on account of motor trouble, expenses incurred in plant of party of the second part, and any and all traveling expenses or other expenses which have been paid or incurred by party of the second part to make good with its respective customers on account of motor engine troubles, and where cars have been returned for motor and other car defects, the expense chargeable against party of the first part is to be prorated.

"It is further hereby mutually agreed that the party of the first part will supply sufficient helical cut gears to replace such fibre faced gears, at no charge, as may be found noisy or defective.

"It is further hereby agreed that should any of the motors now or hereafter repaired become defective that party of the first part will make the same good, or pay to party of the second part the expense of so doing, and pay in addition any expenses occasioned to party of the second part on account of defective motors. This clause of this agreement to continue for three (3) months from date of shipment of car by party of the second part.

"It is further hereby mutually agreed that party of the second part will pay any and all notes heretofore given as they mature; that any further indebtedness on account of motors which have been delivered will be paid either in cash, less discount, on June 1, 1910, or by party of the second part giving sixty (60) day note, with interest, therefor, as it may elect.

"In witness whereof the parties hereto, by their duly authorized officers, have executed this agreement in duplicate.

> AMERICAN & BRITISH MFG. CO.
> By CHAS. L. GULICK (Signed)
> Vice-President.
> STAVER CARRIAGE CO.
> By H. B. STAVER (Signed)
> General Manager.

Witness L. P. HALLADAY (Signed)
C. D. HILFERTY (Signed)."

After the foregoing writing was executed by the parties appellant sent several more skilled mechanics in charge of a foreman to the factory of appellee in Chicago, and put them at work there testing the motors and correcting the defects found therein. The most of these men were so engaged all summer, and at least one of them remained there until December 1, 1910. Appellee paid the notes mentioned, but did not pay any part of the bill for the 36 motors shipped February 26, 1910. During the summer of 1910, appellee still being dissatisfied with the motors made various complaints concerning them to appellant and on August 4, 1910, rendered an account to it for work and expense of repairing them and for damages on account of its claimed default in failing to furnish the motors according to the terms of the contract. No satisfactory adjustment of the differences between the parties being accomplished, appellee brought suit in the Circuit Court, and on January 6, 1911, filed its declaration consisting of three special counts and the common counts. The first and second counts were later amended. To the declaration as amended appellant filed the general issue and other pleas. By a plea of set-off appellant alleged that appellee made false statements to it as to the condition of the motors, which appellant relied on and expended large sums of money on the motors, and that appellee had refused to pay for the motors delivered prior to June 1, 1910, and that by reason thereof appellee was indebted to appellant in a sum in excess of that sued for by appellee. Issue was joined on the pleas. A trial resulted in a verdict for appellee for $5,000. After a motion by appellant for a new trial was overruled, judgment was entered on the verdict.

Appellant urges several reasons why the judgment should be reversed. The first ground assigned is, "that appellee, plaintiff below, had no right of action upon the contracts upon which it specially declared, and

which contracts were permitted to be introduced in evidence over the objection of appellant.'' Under this head it is argued that the court erred in overruling the demurrer to the first and second count of the amended declaration and in admitting in evidence the contracts of July 7, 1909, and of April 1, 1910. After the demurrer was overruled appellant elected to and did plead to the counts demurred to. The action of the court in overruling the demurrer cannot, therefore, now be reviewed. Under the issues as framed, these two writings were not only competent but necessary evidence, not only to establish the right of action of appellee, but also to sustain appellant's claim of set-off. The argument on this point has been broadened into a discussion of the question whether under the facts as disclosed in this record appellee has a cause of action on the contracts, or either of them, for the reason, as claimed by appellant, that appellee failed to perform its part of the agreement of April 1, 1910, wherein it agreed to pay by June 1, 1910, for the 36 motors shipped February 26, 1910. In support of that contention appellant cites *Harber Brothers Co. v. Moffat Cycle Co.*, 151 Ill. 84, as holding that where a vendee who has accepted goods delivered under an express contract fails to pay therefor according to the terms of the contract, such vendee cannot maintain an action against the vendor for damages resulting from his failure to perform his contract. The opinion of the court in that case does not support the contention of appellant. What is there said is:

''The question here distinctly presented as the controlling one, is whether a vendee who has accepted goods delivered under an express contract, but *not at the time* or *in the quantity* required by it, with knowledge of the default of the vendor in those respects, but has himself failed, *without legal excuse*, to pay for them according to it, can maintain an action on the contract for such a default of the vendor. We think the general rule, everywhere recognized, is

against it, and has been specifically so applied in analogous cases in Illinois.''

It will be observed that the default of the vendor in that case was a failure to deliver the goods *"at the time"* and *"in the quantity"* specified in the contract. There was in that case nothing predicated on a failure of the seller to furnish goods of the *quality* or *kind* contracted for.

It cannot be doubted that the unconditional acceptance of goods that have been delivered at a later date or in a less quantity than stipulated for is a waiver of such breach of the contract, but we think no Illinois authority can be found holding that the failure to pay for goods that, after delivery to the purchaser, have been found to be defective and not suitable for the purpose for which they were purchased, or that are in other respects not as they were warranted to be, is a waiver of the right to sue for damages resulting from a breach of the warranty. On the contrary, we believe it to be the settled rule in this State that where the subject-matter of the contract is something that is to be manufactured for a special purpose and the manufacturer undertakes that when it is completed and delivered it shall be of a certain quality and suitable for a certain purpose, the performance of that undertaking is a condition precedent to any obligation on the part of the purchaser to pay for the article purchased. *Forbes v. Pausinsky,* 14 Ill. App. 17; *Stein v. Metzger,* 18 Ill. App. 251; *Underwood v. Wolf,* 131 Ill. 425.

Appellant next contends that the contract of April 1, 1910, amounted to a settlement and satisfaction of all claims for damages appellee had resulting from any breach of the contract of July 7, 1909; that by the making of the contract of April 1, 1910, the contract of July 7, 1909, and all rights of the parties under it were extinguished, and that the court erred in instructing the jury that the original contract was or could be the basis of a right of action.

644   APPELLATE COURTS OF ILLINOIS.

Staver Carriage Co. v. American & British Mfg. Co., 188 Ill. App. 634.

This contention is untenable for several reasons. The contract of April 1, 1910, does not purport on its face to supersede the contract of July 7, 1909, but is supplemental to it and dependent on it. It does not purport to be an adjustment of any rights of action by either party against the other growing out of a breach of the contract of July 7, 1909. It is a mere *promise to adjust* the differences that have arisen. While the contract of April 1, 1910, is a formal admission on the part of appellant that the motors furnished by it under the contract of July 7, 1909, were defective and not suitable in the condition in which they were delivered for the purposes for which they were purchased, and while it contains a promise to adjust, perfect and put in first-class condition, the motors delivered under the contract of July 7, 1909, and to allow credit to appellee for "all expenses, *such as* (the italics are ours) freight on cars which have been returned by agents on account of motor trouble, expenses incurred in plant of party of the second part (appellee), and any and all traveling expenses or other expenses which have been paid or incurred by party of the second part to make good with its respective customers on account of motor engine troubles, and when cars have been returned for motor and other car defects, the expense chargeable against party of the first part is to be prorated." There is no reference to damages "such as" loss of profits, or any other damage except "expense," and the covenant to allow credit for the expense is executory. An agreement to do a thing in consideration of the settlement of a controversy or claim is not a satisfaction. It is the doing of the thing agreed upon that has that effect. As Mechem in his work on Sales, vol. 2, page 678, sec. 806, says:

"It is not the second contract but the performance of it which discharges the original contract."

In *First Nat. Bank of Arkansas City v. Leech*, 36 C. C. A. 262, 94 Fed. 310, the Court said:

''An agreement or accord which is to operate as a satisfaction of an existing liability must, before it can have that effect, be fully executed. It is not enough that there be a clear agreement or accord and a sufficient consideration; but the agreement or accord must be executed before it can be pleaded as an accord and satisfaction. If part of the consideration agreed on be not performed, the whole accord fails.''

. See also *City of Memphis v. Brown,* 20 Wall. (U. S.) 289, 308, 309, 22 L. Ed. 264; *Clifton v. Litchfield,* 106 Mass. 34, 40, 41; *Crow v. Kimball Lumber Co.,* 16 C. C. A. 127, 69 Fed. 61; *Coblentz v. Wheeler & Wilson Mfg. Co.,* 40 Ark. 180; *Ogilvie v. Hallam,* 58 Iowa 714; 1 Smith, Lead. Cas. (5th Am. Ed.) 445, 446, and cases there cited; *Henderson v. McRae,* 148 Mich. 324.

It is next insisted that the court erred in permitting evidence to be introduced as to alleged damage by reason of prospective profits and in instructing the jury on that subject. As a general proposition the measure of damage in case of a breach of a warranty of the quality of an article of property sold is the difference between the value of the article delivered and what it would have been worth if it had been as warranted. If, however, the article is sold for a certain specific purpose, and the seller knows it,. and warrants it to be of a particular quality and to be suitable for the purposes for which it is sold, if it is not as warranted, and articles of the kind and quality contracted for cannot be then purchased in the open market, the value of the article for such special purpose is the basis of estimating damage. If the special purpose for which the article is to be used is a resale, or the production of some other article to be sold, then the profits that would have been made thereby are proper elements of damage in case of a breach of the warranty, provided it be established by the evidence to a reasonable certainty that the same would have been sold as contemplated and how much profit would have been realized from the transaction. Mechem on Sales, vol. 2, sec.

1821; *Vickery v. McCormick*, 117 Ind. 594; *Loescher v. Deisterberg*, 26 Ill. App. 520; *Armeny v. Madson & Buck Co.*, 111 Ill. App. 621; Sutherland on Damages, vol. 1, p. 91; *McHose v. Fulmer*, 73 Pa. St. 365; *Carroll-Porter Boiler & Tank Co. v. Columbus Mach. Co.*, 5 C. C. A. 190, 55 Fed. 451; *McKay v. Riley*, 65 Cal. 623; *Bluegrass Cordage Co. v. Luthy*, 98 Ky. 583; *Kenney v. Knight*, 127 Fed. 403; *Guenther v. Taylor*, 23 Ky. Law Rep. 536; *More v. Knox*, 52 App. Div. (N. Y.) 145; *Beeman v. Banta*, 118 N. Y. 538; *Harrow Spring Co. v. Whipple Harrow Co.*, 90 Mich. 147; *Swain v. Schieffelin*, 134 N. Y. 471; *A. J. Anderson Elect. Co. v. Cleburne Water, Ice & Lighting Co.* (Tex. Civ. App.), 44 S. W. 929; *Consumers' Ice Co. v. Jennings*, 100 Va. 719; *Border City Ice & Coal Co. v. Adams*, 69 Ark. 219; *Burr v. Redhead, Norton, Lathrop Co.*, 52 Neb. 617; *Chapman v. Kirby*, 49 Ill. 211; *Roberts, Wicks & Co. v. Lee*, 31 Ky. Law Rep. 266; *Rhodes v. Holladay-Klotz Land & Lumber Co.*, 105 Mo. App. 279; *Reagan Round Bale Co. v. Dickson Car Wheel Co.*, 55 Tex. Civ. App. 509; *Wilson v. Wernwag*, 217 Pa. St. 82; *Richner v Plateau Live Stock Co.*, 44 Colo. 302; *Carlson v. Stone-Ordean-Wells Co.*, 40 Mont. 434; *Kavanaugh Mfg. Co. v. Rosen*, 132 Mich. 44; *Talcott v. Freedman*, 149 Mich. 577; *Lissberger v. Kellogg*, 78 N. J. Law, 85; *Thorn v. Morgan & Whateley Co.*, 135 Mich. 51; *Fred W. Wolf Co. v. Calbraith*, 35 Tex. Civ. App. 505; *Accumulator Co. v. Dubuque St. Ry. Co.*, 64 Fed. 70; *Johnson v. Faxon*, 172 Mass. 466; *Moody v. Peirano* (Cal. App.), 84 Pac. 783.

The motors here involved were purchased for the express purpose of being installed in automobiles and sold, and were warranted to be free from defects of material and workmanship; that the material and workmanship should be thoroughly high class, and that they should be fit for the purpose for which they were purchased. It was not error to admit evidence of the loss of prospective profits.

It was error, however, to submit to the jury by instructions the question of loss of prospective profits until there was evidence from which the jury could determine how much such profits would have been. There was proof amply sufficient to warrant a jury in finding that some automobiles equipped with the motor in question were sold that were not accepted or that were returned because of defects in the motor, but there is no proof to which our attention has been called, or that we have found in this record of nearly 1800 pages, even tending to show how much profit would have been realized on such sales. There is also a dearth of evidence on the question whether other motors of the kind and quality of the ones contracted for by appellee were obtainable in the market at the time of the breach of the contract of July 7, 1909.

During the trial several parts of the motors furnished by appellant under its contract were introduced in evidence by appellee. It is claimed by appellant that no sufficient foundation was laid for their introduction.

In view of the fact that this judgment must be reversed for other reasons, it would serve no useful purpose to go into a detailed analysis of the proof offered in connection with the introduction of those parts. It is enough to say that the admission of that class of exhibits is largely a matter of discretion with the trial judge, and unless such discretion is abused its admission will not constitute reversible error. *American Exp. Co. v. Spellman,* 90 Ill. 455; *Goodrich v. Chicago Great Western Ry. Co.,* 148 Ill. App. 579. When exhibits of that character are offered, there should be proof that they are at the time they are admitted in evidence in the same or at least in substantially the same condition that they were when such condition was material to the issues being tried, or if they have been broken, worn, altered or marred since such time, the court should require evidence to show in what particu-

lar they have been changed; the use to which they were put to produce the wearing, and where material, the test or circumstances under which they were broken or marred, and this should be done whether they are introduced to prove a fact or for the purpose of illustration. While the preliminary proof concerning these exhibits is not in all respects very satisfactory, we are not inclined to hold that their admission was an abuse of the discretion vested in the court.

Among the customers of appellee to whom were sold automobiles into which motors furnished by appellant under the contract of July 7, 1909, were installed, and who found them not satisfactory, were L. S. Gantz of Marshalltown, Iowa, and Frank L. Haller of Omaha, Nebraska. Each of these gentlemen wrote letters to appellee concerning the Staver car in general and the motor furnished for it by appellant in particular, in which they condemn the motor in unstinted terms and in which they praise the car in all respects, except the motor. The letter written by Gantz was dated April 9, 1910. The letter written by Haller was dated five days later. These letters were offered in evidence by appellee and were admitted by the court over the objection of counsel. This was clearly error. The letters were hearsay evidence. They were mere declarations of strangers to the record made out of the presence of the party against whom they were offered and were clearly incompetent under all rules of evidence. We are satisfied from the character of these letters that their admission could not be otherwise than harmful.

The first instruction given at the instance of appellee is, in part, as follows:

" * * * And you are further instructed, that under said provisions of that contract, the fact (if the jury find it from the evidence to be a fact) that the motors in question corresponded to the specifications as to size, dimensions, style and type would not alone be sufficient to fulfill the requirements of the contract,

but said motors should have been free from defects of material and workmanship should be high-class and fit for use in such Staver automobiles as they were furnished for, *and of such a character as to make said automobiles, if not otherwise* defective, *reasonably saleable and marketable and usable when subjected to such use as automobiles are ordinarily put.*  *  *  * "
(The italics are ours.)

The language in italics is complained of and is not defensible. By it the jury were told that appellant was required by its contract to furnish motors that would render the cars in which they were installed reasonably saleable, if not otherwise defective, no matter how ungainly in appearance; what price was charged for them; how ancient the model, or how well or how poorly they were equipped with modern improvements. It is a matter of common knowledge that there are many things that tend to make a car saleable or unsaleable besides the quality of the motor or "defects" in other parts. Appellant did not contract to deliver a motor that would render the cars in which they were installed saleable, but that all motors manufactured and sold should be free from all defects of material and workmanship; that the workmanship should be thoroughly high class, and that the motors should be "fit for the purposes for which they are furnished." Instruction number fifteen, given at the instance of appellee, is objectionable for much the same reason as instruction number one just commented on. Instruction number twenty-three is bad in that it assumes that there was a market value for motors in the condition the motors in question were when they were received by appellee.

Inasmuch as it is unlikely that the evidence upon the next trial will be in all respects identical with that contained in this record, we refrain from a discussion of the question whether the verdict is contrary to the weight of the evidence, as well as all other questions involving purely questions of fact.

For the reasons suggested the judgment of the Circuit Court is reversed and the cause is remanded to that court for a new trial.

*Judgment reversed and cause remanded.*